# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| WENDY DOERING, | Civil No. 12-2629 (JRT/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| WAL-MART STORES, INC., | |
| Defendant. | |

Christopher J. Kuhlman, **KUHLMAN LAW, PLLC**, 333 Washington Avenue North, Suite 300, Minneapolis, MN 55401, for plaintiff.

Rhiannon C. Beckendorf, **LITTLER MENDELSON, PC**, 80 South Eighth Street, Suite 1300, Minneapolis, MN 55402, for defendant.

Plaintiff Wendy Doering brings this action against her former employer Wal-Mart Stores, Inc. ("Walmart") based on events that occurred during her employment as a grocery reclamation associate as well as her termination from that position. Doering brings claims for retaliatory discharge for seeking workers' compensation benefits and failure to offer continued employment after a workplace injury in violation of Minn. Stat. § 176.82, retaliation under the Family Medical Leave Act ("FMLA"), and retaliation for reporting sexual harassment under the Minnesota Human Rights Act ("MHRA").

Walmart moves for summary judgment on each of Doering's claims. Because material issues of fact remain regarding whether Doering was terminated for seeking workers' compensation and FMLA benefits, the Court will deny Walmart's motion with respect to those claims. The Court will grant Walmart's motion with respect to Doering's

claim for failure to offer continued employment as Doering has failed to present evidence upon which a reasonable jury could conclude that she was physically unable to perform her job functions as a grocery reclamation associate after her workplace injury and that Walmart failed to offer her an alternative position.   Finally, the Court will grant Walmart's motion with respect to Doering's claim for retaliation under the MHRA because Doering has failed to demonstrate a causal connection between her report of sexual harassment and any adverse employment action.

## BACKGROUND

## I.   BEGINNING OF DOERING'S EMPLOYMENT

Doering began her employment at Walmart's Hibbing, Minnesota location on September 10, 2002.   (Aff. of Christopher Kuhlman, Ex. 1 (Dep. of Wendy Doering ("Doering Dep.") 45:5-7), Jan. 16, 2014, Docket No. 55.)[1]   Doering first worked as an overnight stocker.   (Doering Dep. 48:15-20.)   Doering later held positions as a sales associate, cashier, department manager, maintenance worker, and direct store delivery associate.   (Id. 48:22-49:21; Kuhlman Aff., Ex. 2 at 00253-00278.)[2]   In her annual performance reviews Doering typically received marks indicating that she was meeting or

---

[1]   Exhibits 1 and 2 to the Kuhlman Affidavit were filed at Docket Number 55, Exhibits 5 through 11 were filed at Docket Number 56, and Exhibits 13 through 21 were filed at Docket Number 57.  In this Order references to exhibits to the Kuhlman Affidavit refer to the number of the exhibit and do not separately reference the docket number.

[2]   With the exception of depositions and documents filed under seal, page number references to exhibits refer to the CMECF pagination.

exceeding Walmart's expectations. (*See, e.g.*, Kuhlman Aff., Ex. 2 at 00253-00254, 00256-00257, 00259-00260, 00262-00263.)

## II.   GROCERY RECLAMATION ASSOCIATE POSITION

In November 2008, Doering accepted a position as a grocery reclamation associate. (Doering Dep. 86:24-87:6.) A grocery reclamation associate is responsible for removing damaged goods from the store – such as dented cans – and submitting claims with respect to those products. (Kuhlman Aff., Ex. 3; Doering Dep. 115:11-116:18.)

### A.   Manny Incident

One of Doering's claims in the present lawsuit arises out of an incident of alleged sexual harassment at work. On November 15, 2011, Doering was scanning products in the grocery receiving area, when Emmanuel Akomaning ("Manny"), a shift manager, carried some boxes into the area. (Doering Dep. 130:22-131:7.) Doering asked Manny if she could help him put the boxes into the compactor or the garbage. (*Id.* 131:6-10.) Manny replied "I can think of something else better you can grab," then giggled and smirked. (*Id.* 131:10-11, 139:15-17; First Aff. of Stephanie Sarantopoulos, Ex. A at 103-04, Dec. 16, 2013, Docket No. 50.) Doering testified that she interpreted this comment to be sexual in nature. (Doering Dep. 131:10-17, 139:9-17.) Doering testified that immediately following the comment she felt violated, scared, and speechless. (*Id.* 131:21-23.) Doering began crying and felt sick to her stomach. (*Id.* 131:23-24.) Doering then ran outside. (*Id.* 132:1-11.)

After staying outside for several minutes, Doering went back inside and reported the incident to the store manager. (*Id.* 132:9-18.) The store manager initiated an investigation and Zach Butler, another manager, interviewed Doering the following day. (*Id.* 134:15-135:10; First Sarantopoulos Aff., Ex. A at 89-92, 106-09.) Butler and the store manager also interviewed two other employees – one who was in the grocery receiving area at the time of the incident and one who had spoken to Doering about the incident. (First Sarantopoulos Aff., Ex. A at 93-102.) Finally, as part of the investigation Butler and the store manager interviewed Manny. (*Id.*, Ex. A at 110-18.) Manny denied that he had made the alleged statement. (*Id.*) During the two-day investigation, Manny was not allowed to return to work. (Kuhlman Aff., Ex. 6 (Dep. of Emmanuel Akomaning ("Akomaning Dep.") 59:2-7).)

The store manager concluded the investigation by determining that Doering's claims were unsubstantiated. (First Sarantopoulos Aff., Ex. A at 88.) Manny was informed that he could return to work and the store manager reminded him that he must maintain a professional working relationship with his coworkers. (Akomaning Dep. 59:11-20.)

Doering was never informed of the outcome of the investigation, but was told that whether discipline was issued was confidential and that the matter "had been taken care of." (Doering Dep. 135:11-13, 135:22-136:7.) Doering testified that after the incident no member of management ever made any negative comments or acted in a negative way toward her in reference to the harassment investigation. (*Id.* 147:5-14.)

## B.      Disciplinary Action

As part of her responsibilities as a grocery reclamation associate, Doering was tasked with donating to a program called Feed America certain goods that could not be returned to vendors.  (Kuhlman Aff., Ex. 4 (Dep. of Louis Clark ("Clark Dep.") 20:24-21:4); Doering Dep. 116:19-117:14.)   When a damaged product was submitted to Doering it was her job to determine whether the product should be sent back to the distributor for a refund, discarded, or donated to the Feed America program, and then process the product accordingly.  (Clark Dep. 20:24-21:4.)

On November 30, 2011, the representative in charge of picking up the Feed America donations called Doering to indicate that he was going to be late to pick up the donations that day, arriving around 1:00 p.m.  (Doering Dep. 163:25-164:2, 168:12-20; Kuhlman Aff., Ex. 8 at 4.)   Doering was not finished scanning the items for the Feed America donation when she took an early lunch, sometime after 11:00 a.m.  (Doering Dep. 164:2-10, 169:3-10.)   Doering intended to return to work and complete the scanning prior to the donation pickup.  (*Id.* 168:10-169:10.)   Doering testified that she told a coworker that the donation box was not ready to be taken as all the items had not been scanned.  (*Id.* 164:6-10.)   When Doering returned from her lunch break she discovered that the donations, including the unscanned items, had already been picked up by the Feed America representative.  (*Id.* 164:11-12; Kuhlman Aff., Ex. 8 at 2.)   An assistant manager had allegedly approved the pickup in Doering's absence.  (Doering Dep. 166:14-167:2; Kuhlman Aff., Ex. 8 at 2.)   Doering immediately told her manager that

unscanned items had been picked up by the Feed America representative.  (Doering Dep. 165:15-19, 166:7-12; Kuhlman Aff., Ex. 8 at 2.)

Following the Feed America incident, on December 2, 2011, Louis Clark, a manager, called a meeting with Doering to discuss the incident, as a well as an October 26, 2011 incident where a scanning error of Doering's resulted in a $735.00 loss to Walmart.  (Kuhlman Aff., Ex. 10.)[3]  On December 2 Doering was issued a "Decision Day" level of discipline.  (*Id.*)  After receiving the discipline, Doering was sent home to write a letter explaining why she should be allowed to keep her job.  (*See* Kuhlman Aff., Exs. 8, 10.)  Doering testified that she believed this discipline was retaliation for her report of sexual harassment because it did not identify any new performance issues but merely "repeat[ed] comments [from] prior coachings."  (Doering Dep. 147:19-148:12.)[4]

Walmart follows a "Coaching for Improvement" policy of discipline.  The policy's stated goal is "to provide instruction and assistance" to employees if their "job performance fails to meet the reasonable expectations and standards for all associates in the same or similar position" or if their "conduct violates a company policy or interferes or creates a risk of interfering with the safe, orderly and efficient operation of [Walmart's] business."  (First Sarantopoulos Aff., Ex. A at 75.)[5]  The policy produced by

---

[3] Clark stated that at the time of the disciplinary action, he was not aware that Doering had made a previous report of sexual harassment.  (Clark Dep. 23:3-6.)

[4] The record contains no documentary evidence of the prior coachings referenced by Doering in her deposition.

[5] Walmart has produced only the Coaching for Improvement policy after it was updated in April 2012, and has not produced the policy that was in place when Doering was disciplined

(Footnote continued on next page.)

Walmart indicates three levels of "coaching" or discipline prior to termination: first written, second written, and third written.  (*Id.*)  An employee may receive only one of each level of coaching in any twelve-month period, but the policy allows levels of coaching to be skipped depending on the particular situation.  (*Id.*)  The "Decision Day" level of discipline received by Doering is equivalent to a third written coaching under the new policy.  (Def.'s Mem. in Supp. of Mot. for Summ. J. at 7 & n.2, Dec. 16, 2013, Docket No. 49.)  A third written coaching is described as:

> Your supervisor or manager may use a Third Written level of coaching to notify you that your job performance or conduct does not meet our expectations, when you have failed to correct a job performance or conduct issue despite a prior First and/or Second Written level of coaching, or if the job performance or conduct warrants a higher level of coaching.
>
> If you receive a Third Written level of coaching, your supervisor or manager will meet with you to discuss the unacceptable job performance or conduct at issue and explain the improvements that you must make and/or the actions that will be taken in light of the unacceptable job performance or conduct at issue.  You will be required to develop a plan of action to correct the problems or concerns that exist.  Your manager will provide you sufficient time during your regularly scheduled shift to develop your plan and will then meet with you to review the plan, discuss your decision regarding making the required improvements, and take appropriate action based on your decision.

(First Sarantopoulos Aff., Ex. A at 75-76.)  The policy also provides that "[i]f your unacceptable job performance or conduct warrants a level of coaching and you have already received a Third Written level of coaching within the 12 months immediately

_____
(Footnote continued.)

on December 2, 2011.  (First Sarantopoulos Aff., Ex. A at 75-77.)  But Doering does not dispute Walmart's characterization of the similarities and differences between the policies.  Therefore, lacking the benefit of both policies with which to conduct its own comparison, the Court will recite the facts regarding the disciplinary policy based on Walmart's characterization.

preceding the unacceptable job performance or conduct, you will be subject to termination." (*Id.*, Ex. A at 76.)

### C.   March 23, 2012 Injury

#### 1.   Compactor Injury

Following the decision day coaching on December 2, 2011, the next event discussed by both parties is the injury that Doering allegedly suffered at work on March 23, 2012.  On March 23 Doering was in the grocery receiving area and unlocked the padlock on the trash compactor to throw away garbage.  (Doering Dep. 176:9-177:20.)  Because some other employees had indicated that they would be coming back to use the compactor soon, after throwing away the garbage, Doering left the compactor unlocked and placed the padlock on an approximately five to six foot tall ledge next to the compactor.  (*Id.* 177:3-9, 178:4-6, 178:25-179:3, 181:8-16; Kuhlman Aff., Ex. 8 at 1.)

Doering then returned to making plastic bales in the baler, which is located adjacent to the compactor and the ledge upon which the padlock was placed.  (Doering Dep. 178:4-15, 181:8-16.)  When she bent down to pick up some plastic, the padlock fell off of the ledge and hit Doering on the back of her neck.  (*Id.* 178:16-179:13, 181:17-19.)  Doering experienced an instant headache and soreness, but continued using the baler. (*Id.* 179:14-18.)

Several minutes after the padlock fell on her neck, Doering reported the incident to her supervisor, Louis Clark.  (*Id.* 180:4-181:6.)  Doering told Clark that she had unlocked the padlock and placed it on the ledge, and it had fallen on her neck while she was helping to make a plastic bale.  (*Id.* 181:8-19.)  Clark asked Doering if she needed to see

a doctor.  (*Id.* 181:20-21.)  Doering told him that she did not think she needed to see a

doctor, because she expected the injury would merely result in a bruise.  (*Id.* 181:21-

182:1.)  Clark told Doering that if she needed to see a doctor in the future she should let

him know.  (*Id.* 181:25-182:1.)  Doering and Clark then filled out an Associate Incident

Report.  (First Sarantopoulos Aff., Ex. A at 120-21.)

### 2.    Policy Regarding Compactor Padlock

Walmart produced a key and lock policy which references the lock on the

compactor, and provides that the "[c]ompactor doors must remained [sic] locked unless

in use by an authorized associate."  (First Sarantopoulos Aff., Ex. B at 11.)[6]  The policy

also provides that "[f]ailure to comply with this policy can result in disciplinary action up

to and including termination."  (*Id.*)  Doering submitted an affidavit indicating that she

had never been provided this policy or any version of it during her employment at

Walmart, and the first time she saw the document was when Walmart produced it in

response to discovery requests.  (Aff. of Wendy Doering ¶¶ 2-3, Jan. 6, 2014, Docket

No. 54; *see* Doering Dep. 248:16-21.)

---

[6] Walmart contends that Doering was "one of the few non-management personnel who had access to the trash compactor, and the discretion to give other Walmart associates access to the trash compactor."  (Def.'s Mem. in Supp. of Mot. for Summ. J. at 5.)  As support, Walmart cites the key and lock policy, but the policy cited says nothing about Doering's access to the compactor specifically or a grocery reclamation associate's access generally.  (*See* First Sarantopoulos Aff., Ex. B at 8.)  Additionally, Zach Butler – a Walmart manager – testified that a sign located on the compactor stated that "associates 18 years and older . . . are authorized to use the compactor."  (Kuhlman Aff., Ex. 7 (Dep. of Zach Butler ("Butler Dep.") 15:2-13).)  Because the undisputed facts in the record do not support Walmart's contentions regarding Doering's relatively exclusive access to the compactor, the Court has not relied upon this contention in ruling on the present motion.

Doering testified that "management and all other associates" routinely placed the padlock on the ledge, as she had done prior to her injury. (Doering Dep. 181:8-13, 248:22-249:5.) Two Walmart managers testified that they had also seen the padlock on the ledge in the course of their employment. (Clark Dep. 11:4-12; Kuhlman Aff., Ex. 7 (Dep. of Zach Butler ("Butler Dep.") 15:18-16:6).) In opposition to Walmart's motion, Doering submitted affidavits of other Walmart employees who aver that "it was a common practice within the store to leave the padlock on the ledge." (Aff. of Roy Kanyo ¶ 8, Jan. 6, 2014, Docket No. 54-1;[7] *see* First. Aff. of Angela Polzin ¶ 7, Jan. 6, 2014, Docket No. 54-2 ("There was a ledge on the bailer where a padlock was stored when not in use. I saw this padlock on the ledge nearly every day that I worked there and was taught through the store's custom and practice that this was where the padlock was to be stored when not in use."); First Aff. of Amy Luepke ¶ 8, Jan. 6, 2014, Docket No. 54-4.) The affidavits of Doering's coworkers indicate that this practice extended to management. (Kanyo Aff. ¶ 9; First Polzin Aff. ¶¶ 9-10; First Luepke Aff. ¶ 9.) The coworkers also aver that they "were never instructed that it was considered an 'unsafe

---

[7] The individual affidavits of Doering's coworkers were filed as attachments to Doering's own affidavit, although her affidavit does not reference the other affidavits as exhibits. (*See* Doering Aff.) Each of the affidavits authored by a coworker that are filed as attachments to Doering's affidavit are referenced by the name of the affidavit's author and the attachment number associated with the affidavit (e.g. Docket No. 54-1 refers to the affidavit of Roy Kanyo filed as the first attachment to Doering's affidavit).

practice' to place the padlock on the ledge of [the] bailer by anyone in management."
(Kanyo Aff. ¶ 6; First Polzin Aff. ¶ 11; First Luepke Aff. ¶ 7.)[8]

### D.    April 2012 Reporting

While on vacation in April 2012 Doering experienced worsening pain in her neck, ear, and shoulder area.   (Doering Dep. 185:19-25.)   When she returned to work on April 25 Doering talked to a shift manager, Jennifer Senogles, and explained to her that she was still in pain following the padlock incident and wished to see a doctor.   (*Id.* 185:19-186:14.)[9]   Senogles then brought Doering to the emergency room.   (*Id.* 187:8-10.)

---

[8] Walmart objects to the admission of these coworker affidavits for several reasons.  With respect to the statements made in the affidavits regarding the policy or practice of leaving the padlock on the ledge, Walmart contends that they should be stricken for failure to comply with Federal Rule of Civil Procedure 56(c).  (*See* Def.'s Reply Mem. at 13-15, Jan. 21, 2014, Docket No. 59.)   In particular, Walmart argues that because these affidavits make references to unidentified managers, they lack foundation, fail to provide "any facts that would allow the Court to determine whether th[e] testimony is relevant to Doering's claims" and are therefore inadmissible. (Def.'s Reply at 14.)  Rule 56(c) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  The Court concludes that the affidavits are proper under Rule 56(c) and will therefore consider the evidence presented in the affidavits.  Walmart has identified no rule of evidence that would prevent these coworker witnesses from testifying about events and practices they observed during their employment, even if they do not recall the name of the individual that they saw commit a particular practice.  Statements to the effect that these employees saw the padlock on the ledge nearly every day and saw members of management place the padlock on the ledge are based on personal knowledge, and are supported by the foundation that the affiants worked at Walmart and observed these practices.  Because this testimony would be admissible at trial, the Court will consider the affidavits on this motion for summary judgment.

[9] Doering testified that after the padlock injury but prior to April 25 her fear of taking time off for her injury increased because "management would walk by and see that I was stiff or hurting, and asked if I was okay, did I need to go home.  There might have been a couple of times they sent me home early." (Doering Dep. 190:14-22.)

The emergency room doctor concluded that Doering had a disk herniation at a bulging disk.  (Kuhlman Aff., Ex. 14 at 1.)  The doctor prescribed acetaminophen, ibuprofen, Lortab, and ice, and indicated that "[s]he may return to work with unrestricted activities as long as she is not using her Lortab at work."  (*Id.*, E. 14 at 2.)  The doctor also recommended that Doering see her personal doctor for a follow-up.  (*Id.*)

Doering returned to work with Senogles after the emergency room visit, but took the remainder of the day off to see her personal doctor for a follow-up.  (Doering Dep. 188:6-9.)  Doering's doctor told her "[h]e wanted [her] off work two to three weeks to start the proper medications [and] look into what kind of treatments" would alleviate her symptoms.  (*Id.* 189:6-11.)  Doering testified that she felt her job was in jeopardy and she told her doctor she only wanted to take a few days off.  (*Id.* 189:12-21.)  The doctor then prepared a "Report of Work Ability" which indicated that Doering could return to work with restrictions five days later – on April 30, 2012.  (Kuhlman Aff., Ex. 15.)  The doctor stated that Doering's degree of work ability was sedentary work, which involves lifting no more than ten pounds, occasional lifting, carrying, walking and standing.  (*Id.*)  The doctor also referred Doering to occupational medicine.  (*Id.*)

At some point on April 25 or 26 Doering spoke with Senogles and another Walmart employee and requested FMLA leave.   (Doering Dep. 194:11-195:14.)  Specifically, Doering testified that she told Senogles that her personal doctor wanted Doering to take two to three weeks off work and that "I was still in pain and that I probably should fill out some sort of paperwork for more time off or a sick time or family leave or something because I was still in a lot of pain."  (*Id.* 244:2-22.)  But Doering was

never offered or asked to fill out the paperwork necessary to request FMLA leave, and never submitted any formal written request for FMLA leave to Walmart related to the padlock injury.   (*Id.* 193:11-22, 212:24-213:23, 245:1-5.)[10]   Although she never completed any paperwork, when Doering requested time off until April 30, Senogles agreed. (*Id.* 244:21-24.)  Accordingly, Doering did not return to work until April 30.  (*Id.* 243:5-14.)

### E.    Workers' Compensation Claim

Although neither party specifically discusses the process by which workers' compensation benefits were sought on Doering's behalf, the record contains a letter to Doering from Claims Management, Inc. ("CMI") – Walmart's third-party administrator of workers' compensation claims – dated April 26, 2012 (the day after Doering went to the emergency room).  (First Sarantopoulos Aff., Ex. A at 122-23.)  The letter states, in relevant part "[w]e have been advised that you have filed a workers' compensation claim with your store and are currently reviewing your claim." (*Id.*)  Doering testified that she did not specifically ask or apply for workers' compensation benefits but does recall being contacted about her injury by CMI.  (Doering Dep. 194:7-13, 201:14-18.)   Doering ultimately received workers' compensation benefits and Walmart paid for her medical bills.  (*Id.* 201:19-22.)

----

[10]  Doering had previously requested and been granted time off for FMLA leave. (Doering Dep. 70-81.)  Doering testified that on those previous occasions, after raising the issue with a manager or supervisor, the manager or supervisor would provide Doering with the necessary documentation to fill out.  (*Id.* 241:25-242:18.)

Counsel for Walmart clarified at oral argument that once an accident is reported that requires medical attention, Walmart's standard procedure is to file a workers' compensation on behalf of the injured employee. (*See also* First Sarantopoulos Aff., Ex. A at 81 (Walmart's Work-Related Injury Policy states that "[i]f an associate chooses to seek medical attention" a workers' compensation request for medical care "should be completed by the treating physician and returned to the Personnel Manager.").) Pursuant to this standard procedure, Doering's workers' compensation claim would have been filed by Walmart on Doering's behalf after Doering went to the emergency room.

## F.   Walmart's Investigation

Because Doering required medical attention as a result of the padlock incident, Senogles was required by Walmart's Associate Work-Related Injury Policy to report the incident through the Incident Reporting System. (First Sarantopoulos Aff., Ex. A at 81.) On April 25, 2012, Senogles completed a "Manager Investigation Report." (*Id.*, Ex. A at 125.) In the report, Senogles described the incident as

> making a plastic bale, [illegible] bags of plastic [fall]ing out from behind the plastic bin, she grabbed them to put them in the plastic bale & something hit her on the back of the neck[.] The lock was on the box by the compactor[.] She was in the compactor prior, but doesn't remember [if she] locked it or if someone else left it open[.]

(*Id.*) In response to the report's question "What did the associate do or fail to do that may have contributed to the incident?" Senogles wrote "Depending on who chose to lock or not lock the baler – this wouldn't of happen[ed] if the associate would have locked the compactor." (*Id.*) In a later application for unemployment benefits Doering stated that

she had told Senogles she "was not sure" if she was the one that had put the lock up on the ledge.  (Kuhlman Aff., Ex. 8 at 6.)

### G.    Termination

On April 30, 2012, Doering returned to work.  (Doering Dep. 245:8-15.)  While at work she was called into a manager's office where she was told that "due to no room for improvement on the prior coachings, and unsafe work practices" that Walmart was terminating her employment.  (*Id.* 245:14-24.)  When she later applied for unemployment benefits, in response to the prompt "Explain what the employer said you did or did not do that caused your discharge," Doering answered "Said I was being let go out of the company due to I caused the accident."  (Kuhlman Aff., Ex. 8 at 1.)[11]

In an Exit Interview form, Walmart's stated reason for termination was "Misconduct With Coachings."  (First Sarantopoulos Aff., Ex. A at 124.)  The Manager Comments section reads:

> On April 25, 2012, Wendy came in to report an incident in regards to a lock falling on her neck.  When she stated the information about the accident she claimed that she was picking up a bag of garbage and a pad lock fell on the back of her neck.  I had asked her why the lock was off the compactor in the first place and she proceeded to tell me that she didn't know why and she wasn't the last one in the compactor because there were deli and bakery associates in there.  After further review of the accident it came to our attention that Wendy was in fact the last person in the compactor and left

---

[11]  Doering also presented evidence that two other Walmart employees experienced retaliation from Walmart when those employees took FMLA leave.  (*See* Second Aff. of Angela Polzin ¶¶ 6-8, Jan. 6, 2014, Docket No. 54-3; Second Aff. of Amy Luepka ¶ 11, Jan. 6, 2014, Docket No. 54-5.)  Because the Court concludes there is sufficient evidence in the record to create a genuine issue of material fact with respect to Doering's FMLA claim, it has not considered these affidavits, and therefore declines to address Walmart's objections to the admissibility of these affidavits.

the lock off the compactor.  She also lied to us about the people who were
in the compactor because she was the only one in it.

(*Id.*)

At her deposition Senogles testified that Doering was terminated "[b]ecause after
review of some of the statements that she was making, after we looked at the video of it,
we saw that she was the last one in the compacter that day and she had told us that she
was not responsible for leaving it open."  (Kuhlman Aff., Ex. 20 (Dep. of Jennifer
Senogles ("Senogles Dep.") 28:12-18).)  Butler testified that he understood Doering's
termination to be "an integrity issue" because she had lied when she told Senogles that
she did not leave the lock off of the compacter.  (Butler Dep. 29:13-20.)

In opposition to the present motion Doering produced a surveillance video of the
area near the compactor taken at the time of the incident that was reviewed by Walmart
during its investigation.  (Kuhlman Aff., Ex. 11.)  This video shows a male employee
using the compactor between 7:14 and 7:16 a.m.  (*Id.*, Ex. 11 at 14:36-16:36.)  Doering
then uses the compactor at 8:44 a.m.  (*Id.* 1:44:45-1:45:50.)  Thereafter, the compactor is
used by a different male employee at 10:30 a.m., (*id.* 3:30:21-3:31:24) a female employee
at 10:52 a.m., (*id.* 3:52:19-3:53:05) and then Doering uses the compactor again at
11:25 a.m. (*id.* 4:24:50.)  Doering removes the padlock and places it on the ledge, leaving
the door to the compactor open.  (*Id.* 4:24:56.)  Shortly thereafter, Doering grabs some
plastic to put in the baler and the injury occurs.  (*Id.* 4:25:22-4:25:34.)

## III.   PROCEDURAL HISTORY

In September 2012 Doering filed an action in St. Louis County District Court alleging (1) that she was terminated in retaliation for seeking workers' compensation benefits in violation of Minn. Stat. § 176.82; (2) that Walmart violated Minn. Stat. § 176.82 by refusing to offer her continued employment within her physical limitations; (3) sexual harassment and sex discrimination in violation of the MHRA; (4) retaliation/reprisal in violation of the MHRA for engaging in the protected activity of reporting sexual harassment; (5)  interference with her right to benefits under the FMLA; and (6) retaliation for exercising protected rights under the FMLA.  (Notice of Removal, Ex. 1 ("Compl."), Oct. 15, 2012, Docket No. 1.)  Walmart removed the case to federal court based on diversity jurisdiction.  (Notice of Removal at 2.)

## ANALYSIS

## I.   STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.     WORKERS' COMPENSATION

Doering brings two claims for violation of Minn. Stat. § 176.82.  Doering alleges both that she was terminated in retaliation for seeking workers' compensation benefits and that Walmart unreasonably refused to offer Doering continued employment within her physical limitations.  (Compl. ¶¶ 35, 42.)

### A.     Retaliatory Discharge

Minnesota Statutes § 176.82 provides that "[a]ny person discharging . . . an employee for seeking workers' compensation benefits . . . is liable in a civil action for damages incurred by the employee."  Minn. Stat. § 176.82, subd. 1.  Minnesota courts apply the *McDonnell Douglas* three-part burden-shifting analysis to retaliatory discharge claims under Minn. Stat. § 176.82 in the absence of direct evidence of retaliatory intent.[12]

---

[12] In her brief, Doering argues that she can prove retaliatory discharge through the direct method of proof.  Courts applying Minnesota law have allowed plaintiffs to use a direct evidence approach to prove claims of retaliation under various statutes.  *See Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1020 (8th Cir. 2011); *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 542 (Minn. 2001).  "Direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for the protected conduct."  *Pye*, 641 F.3d at 1020 (internal quotation marks omitted).  "'[D]irect' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence."  *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004); *see also Friend v. Gopher Co.*, 771 N.W.2d 33, 38 (Minn. Ct. App. 2009) ("In contrast to the process of elimination that takes place under *McDonnell Douglas*, direct-evidence cases are adjudicated based on the strength of affirmative evidence of discriminatory motive.").  "'[D]irect evidence does not include 'stray remarks in the workplace,' 'statements by nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself.'"  *Browning v. President Riverboat Casino-Missouri, Inc.*, 139 F.3d 631, 635 (8th Cir. 1998) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)); *see also Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 953 (8th Cir. 2012) ("[Direct] evidence must be strong and must clearly point to the presence of an illegal motive for the adverse action." (alteration and internal quotation marks omitted)).

(Footnote continued on next page.)

*Kunferman v. Ford Motor Co.*, 112 F.3d 962, 965 (8th Cir. 1997); *Randall v. N. Milk Prods., Inc.*, 519 N.W.2d 456, 459 (Minn. Ct. App. 1994).  To satisfy the first part of the *McDonnell Douglas* test the plaintiff must establish a prima facie case of retaliatory discharge by showing: (1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two.

_____
(Footnote continued.)

Doering argues that four pieces of record evidence constitute direct evidence that her termination was in retaliation for seeking workers' compensation benefits: (1) Doering was terminated four days after applying for workers' compensation benefits; (2) Doering was told she was being fired for causing the accident by failing to lock the compacter; (3) Walmart's explanation that Doering was terminated for lying about her role in the compacter incident is not supported by the surveillance video; (4) Walmart's history of terminating employees after workers' compensation claims.  (*See* Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 28, Jan. 6, 2014, Docket No. 53.)  But this evidence is not direct evidence of discrimination because it "is of the sort that would require a series of inferences to be drawn before a [retaliatory] attitude could be attributed to those who made the employment decisions she challenges." *Cronquist v. City of Minneapolis*, 237 F.3d 920, 925 (8th Cir. 2001).  In other words this evidence is precisely the type that is weighed in the *McDonnell Douglas* test to determine whether an inference of retaliation exists and whether the employer's stated reason for termination was pretext.  None of this evidence provides a **specific** link between the adverse action and the protected conduct necessary to employ the direct evidence method.  *See Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011) (finding direct evidence of a causal link between the protected activity of filing a formal complaint of harassment and plaintiff's termination where the supervisor "wadded up her complaint, called it 'total bullshit,' threw it in the garbage can, told her to leave, and said that he never wanted to see her again"); *Schaefer v. Biolife Plasma LLC*, Civ. No. 11-3468, 2013 WL 5275818, at *5 n.8 (D. Minn. Sept. 18, 2013) (finding that evidence regarding whether the employer's stated reason for termination was true did not provide direct evidence of retaliation but was instead more appropriately analyzed under the *McDonnell Douglas* burden-shifting framework).  The evidence that comes closest to being direct evidence is Doering's evidence that she was fired for causing the accident.  As explained more fully below in the context of pretext there is a difference (albeit a slight one) between firing an employee for getting injured at work (prohibited) and firing an employee for violating company policy (not prohibited).  Here, the statement that Doering was fired for "causing the accident" likely falls into the latter category because Walmart claims Doering caused the injury by failing to follow policy in locking the compacter.  Therefore, this statement on its face does not directly indicate causation between the protected conduct and the termination decision.  Accordingly, because Doering has not presented direct evidence of retaliation, the Court will analyze this case under the burden-shifting framework of *McDonnell Douglas*.

*Dietrich v. Canadian Pac., Ltd.*, 536 N.W.2d 319, 327 (Minn. 1995).  If the employee establishes her prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the employee's discharge.  *Schmitz v. U.S. Steel Corp.*, 831 N.W.2d 656, 670 (Minn. Ct. App. 2013).  If the employer articulates a legitimate nonretaliatory reason, the employee then bears the burden of demonstrating "that the employer's stated reason for its action was more likely than not pretextual."  *Id.* at 670-71; *see also Sigurdson v. Isanti Cnty.*, 386 N.W.2d 715, 720 (Minn. 1986).

### 1.    Prima Facie Case

The parties agree that Doering has satisfied the second element of her prima facie case because she suffered an adverse employment action when she was terminated.  In its initial brief in support of the present motion Walmart also concedes the first element of the prima facie case explaining that "[i]t is undisputed that Ms. Doering filed a workers' compensation claim with Walmart in April 2012 and she was discharged thereafter."  (Def.'s Mem. in Supp. of Mot. for Summ. J. at 12.)  Accordingly, Walmart contests only the third element of the prima facie case – whether a causal connection exists between Doering's termination and her seeking of workers' compensation benefits.  In its reply brief, however, Walmart contends for the first time that Doering did not engage in protected activity because "Doering has presented no evidence . . . to establish that she, herself, 'sought' workers' compensation benefits."  (Def.'s Reply at 3, Jan. 21, 2014, Docket No. 59.)

### a.    Protected Activity

Walmart argues that Doering did not engage in protected activity because she never sought workers' compensation benefits. Specifically, Walmart argues that Doering never requested workers' compensation benefits or filed a workers' compensation claim. Instead, the record demonstrates that Walmart itself sought workers' compensation benefits on Doering's behalf consistent with its practice of automatically filing workers' compensation claims on behalf of employees that suffer an injury at work and require medical attention.

As an initial matter, the Court notes that Walmart did not raise the argument that Doering did not engage in protected activity until its reply brief. "[F]ederal courts do not, as a rule, entertain arguments made by a party for the first time in a reply brief." *See Redking Foods LLC v. Minn Assocs. LP*, Civ. No. 13-0002, 2014 WL 754686, at *4 & n.5 (D. Minn. Feb. 26, 2014) (internal quotation marks omitted) (collecting cases). Because Walmart raised the issue only in its reply brief, Doering did not have an opportunity to respond to the argument and summary judgment on this basis would therefore be inappropriate. *See Salerno v. Ridgewater College*, Civ. No. 06-1717, 2008 WL 509001, at *4 (D. Minn. Feb. 8, 2008) ("It would be unfair to permit a movant to sandbag a nonmovant by asking the court to grant summary judgment on the basis of an argument made for the first time in a reply brief. There was no reason why Ridgewater could not have made the standing argument in its initial brief. Its failure to do so is itself sufficient reason to reject the argument."); *see also Edwards v. Honeywell, Inc.*, 960 F.2d 673, 674 (7th Cir. 1992) (finding that a district court could not grant summary judgment

on a ground raised in a reply brief because the plaintiff did not have an adequate opportunity to respond).

Even if the Court were to consider Walmart's argument – that Doering is not entitled to protection under the workers' compensation statute because Walmart initiated the process of claiming workers' compensation benefits on her behalf – it would conclude that the evidence here is sufficient to determine that Doering was "seeking" workers' compensation benefits within the meaning of the statute. "The Minnesota Supreme Court has not directly addressed whether a claim o[f] retaliatory discharge under Minn. Stat. § 176.82 requires an employee to file a worker's compensation claim." *Tupper v. Boise Cascade Corp.*, 394 F.3d 622, 623 (8th Cir. 2005) (Heaney J., dissenting). Accordingly, the Court's "role is to predict how the Minnesota Supreme Court would resolve the question." *Kaplan v. Mayo Clinic*, 947 F. Supp. 2d 1001, 1009 (D. Minn. 2013). In conducting this inquiry, the Court "may consider relevant state precedent, analogous decisions, considered dicta, and any other reliable data, including intermediate appellate court decisions if they are the 'best evidence' of state law." *Gage v. HSM Elec. Prot. Servs. Inc.*, 655 F.3d 821, 825 (8th Cir. 2011) (alteration and internal quotation marks omitted).

The Minnesota Court of Appeals has concluded that an employee need not actually file or request workers' compensation benefits in order to be "seeking" workers' compensation benefits. *See Schmitz*, 831 N.W.2d at 667 (holding that once an employer "becomes aware that an employee has suffered a workplace injury, the employee is 'seeking' workers' compensation benefits for purposes of a threat to discharge claim");

*Randall*, 519 N.W.2d at 460 (finding that a retaliatory discharge claim could be based upon an employee's intent to seek workers' compensation benefits – where plaintiff "told his employer he was hurt on the job, and he was then immediately fired" even though he had not actually filed a workers' compensation claim). Instead, "**any** employee who has suffered a workplace injury may be perceived to be 'seeking workers' compensation benefits.'" *Schmitz*, 831 N.W.2d at 667 (emphasis in original).

In light of the courts' reasoning in *Randall* and *Schmitz*, the Court concludes that an employee need not actually file a workers' compensation claim on her own behalf in order to be "seeking" benefits under the statute sufficient to constitute protected conduct. Here, Doering has presented ample evidence upon which a jury could conclude that she was injured at work, Walmart was aware of the injury, and workers' compensation benefits were, in fact, sought on her behalf. Walmart cannot insulate itself from liability under Minn. Stat. § 176.82 by routinely applying for workers' compensation benefits on behalf of their employees as soon as an employee suffers an injury, terminating the employee, and then claiming that the employee did not engage in protected conduct. Walmart's proposed construction of the statute would allow Walmart to beat its employees to the punch, so to speak, by always filing a workers' compensation claim on the employee's behalf before the employee can make the claim and thereby deprive its employees of the protections against retaliation provided by Minn. Stat. § 176.82. The Court finds that such a construction is contrary to the "remedial and humanitarian purpose of the Worker's Compensation Act" and the policy of broadly, and liberally construing the Act "in favor of the interests of the claimant." *Harrison v. Schafer Constr.*

*Co.*, 257 N.W.2d 336, 338 (Minn. 1977). Accordingly, the Court finds that Doering has satisfied her prima facie burden of demonstrating that she engaged in protected conduct under Minn. Stat. § 176.82.

### b. Causal Connection

Walmart next argues that Doering has failed to establish a causal connection between her termination and her seeking of workers' compensation benefits because Doering was fired for violating company policy.

In retaliation cases where the temporal proximity between the adverse employment action and the plaintiff's protected activity "is very close," plaintiffs may rest on that proximity exclusively for purposes of establishing a causal connection. *See Tyler v. Univ. of Ark. Bd. of Trustees*, 628 F.3d 980, 986 (8th Cir. 2011). For example, the Eighth Circuit has held that two weeks between the protected conduct and an employee's termination is "sufficient" to establish causation. *See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002) ("This holding is consistent with the overarching philosophy of the *McDonnell Douglas* system of proof, which requires only a minimal showing before requiring the employer to explain its actions."); *see also Wierman v. Casey's General Stores*, 638 F.3d 984, 1000-01 (8th Cir. 2011) (finding one week between protected activity and termination was sufficient to establish prima facie element of causation); *Rouse v. Farmers State Bank of Jewell, Iowa*, 866 F. Supp. 1191, 1205-06 (N.D. Iowa 1994) (collecting cases where temporal proximity was held to be sufficient). Here, Doering was terminated on April 30, 2012, only several days after she was taken to the hospital for her injury (April 25) and a workers' compensation claim

was filed on her behalf (April 26), and the first day that she returned to work after following her doctor's instructions to take time off.   The Court concludes that this temporal proximity is sufficient evidence of a causal connection to defeat summary judgment.[13]

In addition to the temporal proximity, here, Walmart's stated reason for discharge is closely linked to the request for/receipt of workers' compensation benefits which also supports causation.   Doering suffered an injury and received workers' compensation benefits because a lock fell on her neck.   Doering was allegedly terminated for placing the lock in the position it was in prior to her injury.   Whether that reason was legitimate is a question for the pretext stage, but the close similarity between the circumstances giving rise to the injury and the application for benefits and Walmart's stated reason for

---

[13] In arguing that timing alone is insufficient to establish causation for purposes of the prima facie case Walmart relies on a number of inapposite cases.   For example, Walmart cites *Kunferman v. Ford Motor Co.*, 112 F.3d 962 (8th Cir. 1997) for the proposition that "[t]iming alone cannot establish retaliatory intent" and that causation allegations must be substantiated with sufficient probative evidence based on more than speculation, conjecture or fantasy.   *Id.* at 965.   But *Kunferman* in the next sentence goes on to state that in addition to temporal proximity "[a]n employee must establish the employer's knowledge of protected activity."   *Id.* at 965.   Here, in addition to the timing element, it is undisputed that Walmart was aware of the protected activity – that Doering had suffered an injury at work requiring medical attention and workers' compensation benefits had been applied for on her behalf.   Therefore, the causation element as defined in *Kunferman*, does not support Walmart's position that causation is lacking here.   Walmart also cites *Miller v. CertainTeed Corp.*, 971 F.2d 167 (8th Cir. 1992) for the proposition that summary judgment on a retaliation claim is appropriate "even where termination decision occurred shortly after first claim of injury."   (Def.'s Mem. in Supp. of Mot. for Summ. J. at 13.)   But in *Miller*, the court found that the plaintiff **had** presented a prima facie case.   971 F.2d at 171 ("Miller has presented a prima facie case by showing facts sufficient to raise a genuine issue of material fact that he was terminated for filing a worker's compensation claim.").   The court instead affirmed summary judgment because Miller had failed to establish pretext.   *Id.* Accordingly, *Miller* does not support Walmart's contention that the causation element of Doering's prima face case cannot be proved by timing alone.

Doering's termination indicates that there is a causal connection between the two events. *See Schaefer*, 2013 WL 5275818 at *6 ("The allegedly false conduct underlying Schaefer's incident report . . . was the same alleged conduct underlying the request for workers' compensation. The close link between the report of the injury, the request for compensation, and Schaefer's termination satisfies the causal standard."); *Randall*, 519 N.W.2d at 459 (finding a prima facie case of retaliatory discharge where the employee was fired close in time to the claim for workers' compensation for the stated reason that he was dishonest in his workers' compensation claim). Accordingly, the Court concludes that Doering has satisfied her burden of establishing a prima facie case that she was terminated in retaliation for seeking workers' compensation benefits.

## 2.       Legitimate Nonretaliatory Reason

At this step of the *McDonnell Douglas* analysis the burden on the employer is not one of proof or even persuasion, and instead, can be met with "[a] minimal evidentiary showing." *Davis v. KARK-TV, Inc.*, 421 F.3d 699, 704 (8th Cir. 2005); *see also Floyd v. State of Mo. Dep't of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 936 (8th Cir. 1999) ("The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence."). Here, Walmart must merely "articulate[] lawful reasons for the action; that is, . . . produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 257 (1981).

Walmart contends that its "sole reason" for terminating Doering was "her failure to comply with Company policy, which calls for integrity." (Def.'s Mem. in Supp. of Mot. for Summ. J. at 14.) Walmart also states that "unsafe work practices" led to Doering's termination. (*Id.*) Violation of a company policy is a legitimate, nonretaliatory reason for terminating an employee. *See Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003) ("[The Eighth Circuit has] repeatedly held that insubordination and violation of company policy are legitimate reasons for termination." (internal quotation marks omitted)); *Ward v. Emp. Dev. Corp.*, 516 N.W.2d 198, 202 (Minn. Ct. App. 1994) (finding that termination for "violation of a generally understood company policy" satisfied an employer's burden of demonstrating a legitimate, nondiscriminatory reason or termination). Walmart has therefore satisfied its burden of proffering legitimate, nonretaliatory reasons for Doering's termination.[14]

### 3.     Pretext

Because Walmart has satisfied its burden of production in articulating a legitimate, nonretaliatory reason for terminating Doering, the burden shifts back to Doering to establish that the asserted reason for termination was pretext for retaliation. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1046 (8th Cir. 2011). A pretext inquiry "is limited to

---

[14] Doering argues that Walmart has failed to put forth a legitimate, nonretaliatory reason for her discharge because "Doering never lied to Defendant" and therefore the integrity issues cited by Walmart are untrue. These arguments are related to pretext, not Walmart's ability to satisfy the second stage of the *McDonnell Douglas* burden-shifting framework. In other words, Doering does not contend that, if Walmart's stated reasons are **true**, it would have been unlawful for Walmart to discharge her for violating company policy. Accordingly, the Court concludes that Walmart has proffered a reason for Doering's discharge that, if believed, would render her termination lawful.

whether the employer gave an honest explanation of its behavior, not whether its action was wise, fair, or correct." *McKay v. U.S. Dep't of Transp.*, 340 F.3d 695, 700 (8th Cir. 2003) (internal quotation marks omitted).   A plaintiff may demonstrate a material question of fact regarding pretext in at least two ways, either by showing "that the employer's explanation is unworthy of credence because it has no basis in fact" or "by persuading the court that a prohibited reason more likely motivated the employer." *Torgerson*, 643 F.3d at 1047 (alterations and internal quotation marks omitted); *see also Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 521 (8th Cir. 2010).   A plaintiff may establish an inference of pretext in a number of ways, such as "by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Lake v. Yellow Transp. Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).

The Court finds that Doering has presented sufficient evidence upon which a jury could conclude that Walmart's stated reason for her termination has no basis in fact. First, with respect to Doering's truthfulness or integrity as the basis for her termination, the Court finds that there are sufficient facts upon which a jury could conclude that the individuals in charge of Doering's termination had no basis in fact to believe that she was untruthful regarding the circumstances of the trash compactor incident.   In her April 25, 2012 Manager Investigation Report, Senogles described the trash compactor incident and specifically noted that Doering had told her that she did not remember if she had locked the trash compactor "or if someone else left it open."   (First Sarantopoulos Aff., Ex. A at 125.)   Although Senogles' initial report indicated that Doering could not remember

whether she was the last person in the compactor and had left the padlock off, in the Exit Interview form the manager comments section indicated that on April 25 Doering had lied when she told Senogles that she was not the last one in the compactor, because later investigation revealed that she "was in fact the last person in the compactor and left the lock off the compactor." (*Id.*, Ex. A at 124.)   Additionally, Senogles testified that Doering was terminated for being untruthful because "she had told us that she was not responsible for leaving it open." (Senogles Dep. 28:12-18.)   Based on this evidence, a reasonable jury could conclude that Doering truthfully told her managers that she could not remember whether she, or someone else, was the last person in the trash compactor, and that Walmart's stated reason for Doering's termination – that she lied when she told her managers that she was not the last person in the trash compactor – has no basis in fact.   In other words, Doering's initial statement did not actually deny having left the compactor unlocked, but rather left open the possibility that she (or another worker) had done so.   Thus, it cannot be said that she made an untrue statement to her supervisors by affirmatively stating that she was **not** the last person to use the compactor.   Therefore, a reasonable jury could conclude that Walmart did not "in good faith believe[] that [Doering] was guilty of the conduct justifying discharge." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1002 (8th Cir. 2012) (internal quotation marks omitted).

Additionally, a jury could conclude that Walmart's other stated reason for termination – that Doering engaged in unsafe work practices by failing to follow the key and lock policy – is pretextual because Walmart did not enforce this policy against other similarly situated employees.   First, Doering presented evidence from several Walmart

employees and managers who testified that it was a common practice within the store to leave the padlock on the ledge, rather than an offense that warranted discipline or termination.  Additionally, Doering testified that immediately after the padlock hit her in the neck on March 23, 2012, she reported the incident to Clark.  Doering testified that she told Clark that she had unlocked the trash compactor, placed the padlock on the ledge, and that later the lock fell and hit her on the neck.  This conversation would have alerted Clark to the fact that Doering had failed to follow the policy that "[c]ompactor doors must remained [sic] locked unless in use by an authorized associate."  (First Sarantopoulos Aff., Ex. B at 11.)  Although Clark was alerted to Doering's apparent violation of the key and lock policy on March 23, she was not terminated for failing to follow this policy until April 30 – four days after a workers' compensation claim was submitted on her behalf.  Finally, Doering testified that she was told that her termination was because she had caused an accident, and this focus on the **accident** suggests that her need for workers' compensation played a role in the termination decision.  Based upon this record, a reasonable jury could conclude that Doering's termination for unsafe work practices was pretext and that her seeking workers' compensation benefits more likely motivated the decision.  Accordingly, the Court will deny Walmart's motion for summary judgment with respect to this claim.

### B.      Refusal to Offer Continued Employment

Minnesota Statutes § 176.82, subd. 2, provides that:

> An employer who, without reasonable cause, refuses to offer continued employment to its employee when employment is available within the

employee's physical limitations shall be liable in a civil action for one year's wages.

Doering contends that Walmart violated this provision because she could have performed her grocery reclamation position consistent with the doctor's "sedentary work" restriction when she returned to work or Walmart could have provided her with "a light duty work position after her injury." (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 34, Jan. 6, 2014, Docket No. 53; *see also* Compl. ¶¶ 41-42.)

Section 176.82, subdivision 2 applies where a plaintiff, because of a workplace injury, is unable to perform the essential functions of her job, and is terminated for that reason rather than being offered a position within her limitations. *See, e.g.*, *Johnson v. J.B. Hunt Transp., Inc.*, Civ. No. 12-2031, 2013 WL 6731935, at *6, *12 (D. Minn. Dec. 19, 2013) (allowing a claim under § 176.82, subd. 2 to go forward where the employer "did not attempt to find [plaintiff] light duty work" and "never allowed [plaintiff] to return to work after his second injury and terminated him" where there was evidence that the employer had "created short-term light duty positions for injured employees" in the past); *Poganski v. St. Cloud Hospital*, Civ. No. 01-20, 2002 WL 989481, at *6 (D. Minn. May 10, 2002) (denying defendant's motion for summary judgment on a claim under § 176.82, subd. 2 where plaintiff returned to work in her position with modifications but reported that she was still suffering from severe pain and defendant terminated her rather than offering her a different position).

Here, Doering makes no claim that when she returned to work on April 30 she was unable to perform her job functions as a grocery reclamation associate as a result of her injury such that she would need accommodations from Walmart. *See Lundquist v. Rice*

*Memorial Hosp.*, No. A07-0683, 2008 WL 467439, at*4 n.2 (Minn. Ct. App. Feb. 12, 2008) (noting that Minn. Stat. § 176.82, subd. 2 "may mandate some degree of reasonable accommodation"). Nor is there any evidence in the record that Walmart terminated Doering because she was physically unable to perform her job functions as a result of her neck injury. Instead, the record reflects that Doering returned to work for several hours in her position as a grocery reclamation associate position and was physically capable of performing her duties despite her injury. Accordingly, the Court concludes that summary judgment in Walmart's favor with respect to Doering's claim under § 176.82, subd. 2 is appropriate, as no reasonable jury could conclude that Walmart refused to offer Doering continued employment within her physical limitations.[15]

## III.   FMLA CLAIMS

The Eighth Circuit has explained that there are three primary types of claims under the FMLA. "The first type, arising under § 2615(a)(1) occurs where an employer refuses to authorize leave under the FMLA or takes other action to avoid responsibilities under the Act." *Pulczinski*, 691 F.3d at 1005. This type of claim is referred to as an "entitlement" claim. *Id.* The second type of claim is a "retaliation" claim and is used where "an employee opposes any practice made unlawful under the FMLA – for example, if an employee complains about an employer's refusal to comply with the

---

[15] Walmart argues that summary judgment on this claim is appropriate because it had "reasonable cause" to terminate Doering. (Def.'s Mem. in Supp. of Mot. for Summ. J. at 16.) In light of the pretext discussion above, the Court notes that reasonable cause is the subject of a genuine issue of material fact, and therefore does not provide a basis for summary judgment.

statutory mandate to permit FMLA leave – then the employer may not for that reason take adverse action against the employee who is engaged in the opposition." *Id.* at 1005-06. The final type of claim is described by the Eighth Circuit as a "discrimination" claim. *Id.* at 1006. A discrimination claim

> arises when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA. In this scenario, the employer does not prevent the employee from receiving FMLA benefits. Rather, it is alleged that after the employee exercised his statutory rights, the employer discriminated against him in the terms and conditions of employment. An employee making this type of claim must prove that the employer was motivated by the employee's exercise of rights under the FMLA.

*Id.* at 1006.

Doering purports to bring two separate claims under the FMLA. In a claim entitled "interference" Doering alleges that Walmart interfered with her rights under the FMLA by "fail[ing] to provide Plaintiff with appropriate notice of her FMLA rights and responsibilities after she requested leave covered by the FMLA," "den[ying] Plaintiff leave she was entitled to take under the FMLA," and "refus[ing] to reinstate Plaintiff's employment." (Compl. ¶¶ 68-70.) In a "retaliation" claim, Doering alleges that Walmart "terminated Plaintiff's employment after she exercised leave covered under the FMLA." (*Id.* ¶ 75.) Although Doering's claims are not a model of clarity in that she contends both that she was not allowed to take FMLA leave and also that she was terminated in retaliation for taking FMLA leave, the Court concludes that Doering's FMLA claims as a whole most closely approximate an FMLA discrimination claim as defined by the Eighth

Circuit.  In other words, Doering appears to be arguing primarily that Walmart terminated her because she exercised her rights to FMLA leave.[16]

FMLA discrimination claims are analyzed under the same burden-shifting framework described above.  *See Pulczinski*, 691 F.3d at 1007; *see also Wierman*, 638 F.3d 999.  The only issue with respect to Doering's FMLA claim that materially differs from the analysis employed by the Court with respect to her workers' compensation claims is whether she exercised rights to which she was entitled under the FMLA sufficient to demonstrate a prima facie case for a discrimination claim.  *See Wierman*, 638 F.3d at 999-1000 (explaining that an employee must show she engaged in protected conduct to meet her prima facie burden).  Walmart argues that Doering did not engage in protected conduct because she never took leave that was actually designated as FMLA leave.  Instead, when she requested FMLA leave Walmart simply approved the time off, but did not provide Doering with FMLA paperwork.

"In order to benefit from the protections of the [FMLA], an employee must provide her employer with enough information to show that she may need FMLA leave." *Wierman*, 638 F.3d at 1000 (alterations and internal quotation marks omitted).  It is not necessary for an employee to "invoke the FMLA by name in order to put an employer on notice that the Act may have relevance to the employee's absence from work." *Id.*

---

[16] Although Walmart did not characterize it as   July 11, 2014FMLA s/ ermit Doering to take the time off work that she requested – until April 30 – as listed in her doctor's note.  In this context, this grant of leave serves the purpose of the benefits accorded under the statute, even if Walmart and Doering did not fill out the proper forms.  Accordingly, to the extent Doering brings an entitlement claim, the Court finds that summary judgment in Walmart's favor with respect to that claim is appropriate.

(internal quotation marks omitted).  The Court finds that the record is sufficient here to establish a prima facie case that Doering engaged in protected conduct.  On April 25 or 26 Doering spoke with Senogles and requested FMLA leave.  This was sufficient to put Walmart on notice that Doering was seeking benefits under the Act.  Doering testified that on previous occasions when she had requested FMLA leave a manager or supervisor would provide her with the necessary paperwork to complete.  But instead of providing her with FMLA paperwork, Senogles simply agreed that Doering could take time off until April 30.  Walmart cannot circumvent liability under the FMLA by allowing an employee who requests FMLA leave to take time off, failing to provide the employee with the necessary paperwork to designate the time off as FMLA leave, and then terminating the employee for taking leave.  *See Wierman*, 638 F.3d at 1000 (finding that an employee met her prima facie case where her employer was on notice of her serious health condition and were awaiting her FMLA paperwork when the employee took leave and was terminated); *cf. Phillips v. Mathews*, 547 F.3d 905, 910 (8th Cir. 2008) ("[I]t is immaterial that Phillips was terminated before she submitted her FMLA paperwork or before Appellees learned she needed additional time off from work. . . . Because Appellees had notice that Phillips's doctor's appointment could potentially be covered by the FMLA, they do not escape liability by simply terminating her before she could inform them of the results of her appointment . . . .").  Therefore, the Court finds that Doering has satisfied her prima facie burden of demonstrating that she engaged in protected conduct when she requested FMLA leave and was allowed to take time off of work.

Because the request for FMLA leave occurred within a day of the workers' compensation claim and was related to the injury at work, the Court's analysis of causation with respect to that claim applies with equal force here. The Court's analysis of Walmart's proffered nonretaliatory reason for discharge and Doering's showing of pretext are similarly applicable here. Accordingly, the Court will deny Walmart's motion for summary judgment with respect to Doering's claim that she was terminated for taking FMLA leave.

## IV.   RETALIATION UNDER THE MHRA[17]

Doering claims that the "Decision Day" disciplinary action on December 2, 2011, and her termination were retaliation for her report of sexual harassment arising out of the incident with Manny. "Under the MHRA, employers may not retaliate against employees for reporting sexual harassment." *Quinn v. St. Louis Cnty.*, 653 F.3d 745, 751 (8th Cir. 2011) (citing Minn. Stat. § 363A.15). Claims for retaliation under the MHRA are analyzed under the same *McDonnell Douglas* burden-shifting framework outlined above. *Id.* Therefore, to establish a prima facie case Doering must show that (1) she engaged in protected conduct, (2) she suffered a materially adverse employment action, and (3) a causal connection exists between the materially adverse employment action and the protected conduct. *Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1077-78 (8th Cir. 2010).

---

[17] In opposing summary judgment, Doering seeks dismissal of her hostile work environment claim based on sexual harassment and discrimination on the basis of sex arising out of Manny's comment. (Pl.'s Mem. in Opp. to Mot. for Summ. J. at 35 n.8.) Accordingly, the only claim remaining with respect to the Manny incident is the retaliation claim. The Court will therefore grant Walmart's motion for summary judgment with regard to the Count III hostile work environment claim.

The Court finds that Doering's retaliation claim cannot survive summary judgment because she has failed to demonstrate a causal connection between her report of the Manny incident and either the December 2 disciplinary action or her termination. To satisfy this element of her prima facie case, Doering must present evidence showing that Walmart's "retaliatory motive played a part in the adverse employment action." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006) (internal quotation marks omitted). In order to establish causation "[a] plaintiff must show the employer had actual or constructive knowledge of the protected activity." *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 715 (8th Cir. 2000). Additionally, where, as here, a plaintiff relies solely upon temporal proximity to establish causation, the protected conduct and the adverse employment action must occur close in time. *See Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 633 (8th Cir. 2005); *see also Sisk v. Picture People, Inc.*, 669 F.3d 896, 901 (8th Cir. 2012) ("More than two months is too long to support a finding of causation without something more.").

The Court concludes that no causation exists between the December 2 disciplinary action and Doering's report of the Manny incident, because it is undisputed that Clark – the manager in charge of imposing that discipline – was unaware that Doering had made a previous report of sexual harassment. *See Buytendorp v. Extendicare Health Servs., Inc.*, 498 F.3d 826, 836 (8th Cir. 2007) (finding no causal connection where employee had "presented no evidence suggesting" that the individual who threatened her termination was aware of her protected conduct); *Wolff v. Berkley Inc.*, 938 F.2d 100 (8th Cir. 1991) (holding that a causal link between statutorily protected activity and an adverse

employment action "does not exist if the employer is not aware of the employee's statutorily protected activity").

Additionally, with respect to termination the Court finds that the temporal proximity is too attenuated to support an inference of causation.  Here, Doering reported the Manny incident after it occurred on November 15, 2011, but Doering was not terminated until April 30, 2012.  Without more evidence of a relationship between Doering's report and her termination, this five-month gap is too long to establish the causation element of Doering's prima facie case.  *See Sisk*, 669 F.3d at 901; *Feltmann v. Sieben*, 108 F.3d 970, 977 (8th Cir. 1997) (finding that plaintiff fired six months after the complaint, without more, was insufficient temporal proximity to establish a causal link).  Because Doering has failed to demonstrate a causal connection between her report of the Manny incident and either the December 2 discipline or her termination, the Court will grant Walmart's motion for summary judgment with respect to Doering's claim for retaliation under the MHRA.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 47] is **GRANTED in part** and **DENIED in part** as follows:

1.    Defendant's motion is **GRANTED** with respect to Plaintiff's claims for refusal to offer continued employment in violation of Minn. Stat. § 176.82 (Count II), sex discrimination/sexual harassment in violation of the MHRA (Count III), and

retaliation/reprisal in violation of the MHRA (Count IV).  These claims are **DISMISSED**

**with prejudice**.

    2.     Defendant's motion is **DENIED** with respect to Plaintiff's claims for

retaliatory discharge in violation of Minn. Stat. § 176.82 (Count I).  Defendant's motion

is also **DENIED** with respect to Plaintiff's claims for interference in violation of the

FMLA (Count V), and retaliation in violation of the FMLA (Count VI) to the extent those

claims allege that Doering was terminated for exercising her rights under the FMLA.


DATED:  July 11, 2014                 _____

at Minneapolis, Minnesota.                s/ John R. Tunheim

                                        JOHN R. TUNHEIM

                               United States District Judge